**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **ODIS RUSHING**             ) | |
|     **ID# 1323592**             ) | |
|         **Petitioner,**       ) | |
| **vs.**                              ) | **No. 3:09-CV-1536-K (BH)** |
|                                   ) | |
| **RICK THALER, Director,**      ) | **Referred to U.S. Magistrate Judge** |
| **Texas Department of Criminal**  ) | |
| **Justice, Correctional Institutions Division,**  ) | |
|     **Respondent.**          ) | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**

Pursuant to the provisions of 28 U.S.C. § 636(b) and an Order of the Court, this case has been referred for findings, conclusions, and recommendation.

**I. BACKGROUND**

On August 14, 2009, petitioner filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction for aggravated robbery in cause F05-48440-I. Respondent is Rick Thaler, Director of TDCJ-CID.

**A. Factual and Procedural History**

On February 16, 2005, the State indicted petitioner for the aggravated robbery of Nell Brown on or about January 17, 2005. (Trial Transcript:2). He pled not guilty and was tried before a jury on August 23, 2005. The jury found him guilty and sentenced him to sixty-seven years' imprisonment. (R. 3:176, 216).

The state appellate court recounted the evidence presented at trial as follows:

> On January 17, 2005, Nell Brown was waiting for a bus after buying groceries at the Albertson's on the corner of McKinney and Lemmon in Dallas. She was walking back and forth because it was cold that day. A black man approached her and asked her what time the next bus would arrive. She answered, "In about ten minutes." As she turned and faced the man, she saw that he was holding a knife with a three to four inch blade, and he demanded her purse. She

handed him her billfold and he ran away across a parking lot. Because the billfold contained $100 in case, a debit card, and identification, Brown began chasing after him while yelling, "He's got my billfold!" As she chased the robber, Brown saw another young man talking on a cell phone in the parking lot and she later learned that he called 911. The robber got into a car and sped away from the scene. Brown was later shown a photo lineup but she was unable to positively identify any of the men as the man who robbed her. Although Appellant looked similar to the ran who robbed her, she was also unable to make an in-court identification.

Marcus Johnson, a student at Parker College of Chiropractic, was in the parking lot at Albertson's when he saw a black man running towards him. Johnson saw that the man was being followed by a woman who was obviously upset and frantic. Johnson heard her say, "My purse" and he again looked at the man who was running towards him. Johnson thought about intervening but backed off when he saw a knife "flash out from underneath his shirt." He recalled that the man was wearing a dark blue jacket and the knife blade was about four inches in length. Johnson identified State's Exhibit 3, a photograph of a dark blue jacket, as the jacket worn by the robber. He watched the man run past him and get into the driver's seat of a blue Hyundai that was backed into a parking spot. The car started quickly and then "burned out" of the parking lot with its tires squealing. Johnson got the vehicle's license plate and called 911. He had a good look at the man's face as he ran towards him and when he got into the car. Based on his memory of these events, Johnson made an in-court identification of Appellant as the man he had seen in the Albertson's parking lot running from Nell Brown. Johnson also recalled that the police contacted him several hours after the robbery and showed him a photo lineup at approximately 2:30 a.m. He signed the back of the photograph that he thought was the suspect. He based his identification solely on facial features, not any other distinction such as different clothing or background colors.

At approximately 4:30 p.m. on January 17, 2005, Corporal Nichols of the Dallas Police Department began his off-duty security job at Albertson's. Approximately one minute after he arrived, Nichols heard the robbery dispatch and he began looking around the premises to find the witnesses. Nell Brown was waiting in the store's witness room and Nichols could see that she was visibly shaken. He began gathering information from Brown while they waited for a patrol officer to arrive. As he spoke with her, Nichols realized that he had seen the vehicle used in the robbery as he drove into the parking lot. Nichols reviewed the videotape from the store's security

cameras and found footage of a small, dark-colored vehicle. The video quality was poor but he was able to see a figure exit the vehicle and walk over to where Brown was waiting at the bus stop. Within ten seconds, the figure ran back to the vehicle with another person in pursuit. He jumped into the car and drove away. The video was not preserved for trial but Nichols printed two stills off of it in the hope that something in the photos might be recognizable. However, the picture quality was so poor that he was unable to get a license plate number or identify the individual depicted in the video.

Police officer Juan Aguinaga was on duty the evening of January 17, 2005. He had received over his computer the license plate and description of a dark blue 2000 four-door Hyundai vehicle used in an armed robbery. At approximately 11:45 p.m., Aguinaga saw a the [sic] vehicle matching the description and license plate and he stopped it. Because he was making a felony stop, Aguinaga asked for cover and several patrol cars arrived. The officers arrested the driver of the vehicle, Appellant, and detained the passenger, Louis Leonard.

Police officer Mark Anthony Torres responded to Aguinaga's request for backup. As Appellant exited the vehicle, Torres saw him drop something on the ground. After Appellant was secured, Torres picked up the item which Appellant had dropped and saw that it was a driver's license issued to Nell Marie Brown. Torres also searched the center console of the vehicle and found a checkbook and a Visa check card both bearing Nell Brown's name. He also found some knives.

Jesse Woods, a Dallas Police Officer, also responded to Aguinaga's request for cover. Woods searched Appellant's person following his arrest and found a Bank of America debit card bearing the name of Nell Brown. Appellant was wearing a dark blue jacket at the time of his arrest and a photograph of the jacket was admitted into evidence as State's Exhibit 3. The jacket was also admitted into evidence.

Detective William Brook Smith presented two photo line-ups to the complainant, Nell Brown. One lineup contained Appellant's photograph and the other lineup contained the photograph of Leonard. Brown was unable to identify either man. Smith also showed Johnson the photo lineup containing Appellant's photograph. When Johnson positively identified Appellant as the man he saw running from Brown earlier that day, Smith did not show him Leonard's photograph.

3

*Rushing v. State*, No. 08-05-00365-CR, slip op. at 1-4 (Tex. App.–El Paso, Aug. 23, 2007, pet. ref'd).

On direct appeal, petitioner alleged that the evidence was factually insufficient to support his conviction, and that the prosecutor erred by in effect informing the jury panel during voir dire that petitioner had a prior conviction. Petitioner's conviction was affirmed on direct appeal. His petition for discretionary review was refused. *See* PDR-1324-07.

Petitioner filed a state habeas application on July 30, 2008, alleging the same grounds for relief as in his federal petition. (State Habeas Transcript:7-11, 14). On February 18, 2009, the Court of Criminal Appeals denied relief without written order. (S.H.Tr.:cover).

On August 14, 2009, petitioner filed his petition for federal habeas relief. (*See* Pet. Writ of Habeas Corpus (Pet.) at 9).[1] Respondent filed a response on December 9, 2009, and provided the state court records. No reply brief was filed.

**B.  Substantive Issues**

Petitioner claims that: 1) the State withheld exculpatory evidence from the defense in violation of *Brady v. Maryland*; 2) a witness identified petitioner after being shown an improperly suggestive pretrial photo array; 3) the State violated the "best evidence" rule in violation of petitioner's due process rights; and 4) the trial court violated his due process rights by failing to grant a mistrial during voir dire and by informing the jury that probation was not an issue in petitioner's trial. Respondent does not contend that petitioner failed to exhaust any of his claims at the state level.

---

[1] *See also Coleman v. Johnson*, 184 F.3d 398, 401 (5th Cir. 1999) (recognizing that prisoners file their federal pleadings when they place them in the prison mail system).

## II.  APPLICABLE LAW

Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. 104-132, 110 Stat. 1217, on April 24, 1996.  Title I of the Act applies to all federal petitions for habeas corpus filed on or after its effective date.  *Lindh v. Murphy*, 521 U.S. 320, 326 (1997).  Because petitioner filed the instant petition after its effective date, the Act applies to his petition.

Title I of AEDPA substantially changed the way federal courts handle habeas corpus actions.  Under 28 U.S.C. § 2254(d), as amended by AEDPA, a state prisoner may not obtain relief

> with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

"In the context of federal habeas proceedings, a resolution (or adjudication) on the merits is a term of art that refers to whether a court's disposition of the case was substantive, as opposed to procedural."  *Miller v. Johnson*, 200 F.3d 274, 281 (5th Cir. 2000).  Here, the denial of petitioner's state writ constitutes an adjudication on the merits of the claims fairly presented to the Texas Court of Criminal Appeals in such writ.  The AEDPA standards enumerated in 28 U.S.C. § 2254(d) thus apply to the claims raised in petitioner's federal petition.

Section 2254(d)(1) concerns pure questions of law and mixed questions of law and fact. *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir. 2001).  A decision is contrary to clearly established federal law within the meaning of § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case

differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

With respect to the "unreasonable application" standard, *Williams* instructs that a writ must issue "if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413; *accord Penry v. Johnson*, 532 U.S. 782, 792 (2001). Likewise under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." 529 U.S. at 407. "[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Id.* at 409; *accord Penry*, 532 U.S. at 793.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000). Under § 2254(d)(2), federal courts "give deference to the state court's findings unless they were 'based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.'" *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir. 2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the state prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### III.  EXCULPATORY EVIDENCE

In his first ground for relief, petitioner asserts that the state withheld exculpatory evidence from the defense because the security camera videotape from the grocery store was not preserved and provided to defense counsel. In particular, petitioner asserts that the quality of the videotape was "excellent" and that it would have shown the make, model, and license plate number of the

vehicle used by the person who actually committed the robbery. (Pet. at 7). Petitioner contends that the failure to provide this videotape to the defense severely prejudiced his defense.

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the Supreme Court held that a prosecutor must disclose evidence to a criminal defendant if that evidence is favorable to the defendant and material to his guilt or punishment. "*Brady* claims involve 'the discovery, after trial of information which had been known to the prosecution but unknown to the defense.'" *Lawrence v. Lensing*, 42 F.3d 255, 257 (5th Cir. 1994). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). Evidence is material within the meaning of *Brady* only when there is a reasonable probability of a different result at trial had the evidence been disclosed. *Wood v. Bartholomew*, 516 U.S. 1, 5 (1995).

> The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 678 (1985)). In other words, there must be "a 'significant possibility' of a different result to characterize the *Brady* materiality standard." *Strickler*, 527 U.S. at 300 (Souter, J., concurring).

Here, Corporal John Nichols testified at trial that he was informed of the robbery after reporting for his off-duty job at Albertson's and immediately began his investigation. As part of this investigation, he looked at the digital recording made from the numerous cameras that the store had mounted outside of the store. He described the condition of the recording as "poor, at best." (R. 3:100-104). He was able to see a figure get out of a car, walk over to the bus stop, approach Nell

7

Brown, and run back with another person in pursuit ten seconds later. He was also able to see the figure enter a car and drive off, but he could not see facial features on the figure or the license plate on the car. The video was not preserved for trial, but he did print out two poor quality photographs from the digital recording, and they were admitted into evidence at trial. (R. 3:105-09; R. 4:State's Ex. ##6,7).

The record does not reflect that the store videotape contained any exculpatory evidence. The police officer who actually viewed the recording testified at trial that the quality of the tape was poor and that he could not identify any physical features of either the person or the vehicle. The two photographs from the digital tape that were admitted into evidence reflect the poor quality of the recording. Petitioner has failed to establish the elements of a *Brady* violation.

Nor has petitioner established a claim under *Arizona v. Youngblood*, 488 U.S. 51, 57 (1989), which held:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady,* makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant.

The Supreme Court went on to hold that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.* at 58. Petitioner has not shown that any failure to preserve evidence was the result of any bad faith on the part of law enforcement personnel, or that the videotape recording had evidentiary value.

The state habeas court denied this claim on its merits. (S.H.Tr.:cover). This denial is not contrary to federal law, and this ground for relief should be denied.

## IV. PRETRIAL IDENTIFICATION

In his second ground for relief, petitioner asserts that the photo array that was shown to eyewitness Marcus Johnson was impermissibly suggestive because he was shown a lineup of photographs containing petitioner's photograph but not one containing a photograph of passenger in the car.

The Due Process clause protects accused individuals from the use against them of unreliable identification evidence that resulted from impermissibly suggestive procedures. *Manson v. Brathwaite*, 432 U.S. 98 (1977). The key factor in determining the admissibility of identification testimony is whether, under the totality of the circumstances, the identification was reliable. *Id.* at 114. To evaluate whether "an improper pretrial identification was made," the courts look to the standard enunciated in *Simmons v. United States*, 390 U.S. 377 (1968). *See United States v. Burbridge*, 252 F.3d 775, 780 (5th Cir. 2001). In *Simmons*, the Supreme Court held "that convictions based on eyewitness identification at trial following" a challenged pretrial identification "will be set aside on that ground only if the . . . identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. 377, 384 (1968).

The courts employ "[a] two-step analysis" to determine whether there is a *Simmons* violation: "first, we determine whether the identification procedure was impermissibly suggestive; if it was, we determine whether, under the totality of the circumstances, the suggestiveness led to a substantial likelihood of irreparable misidentification." *Burbridge*, 252 F.3d at 780. If the answer to both questions is yes, the identification is inadmissible. *United States v. Sanchez*, 988 F.2d 1384, 1389 (5th Cir. 1993). The five factors to be considered in determining the likelihood of misidentification are: 1) the opportunity of the witness to observe the criminal at the time of the crime; 2) the

9

witness's degree of attention; 3) the accuracy of the witness's prior description; 4) the witness's level of certainty; and 5) the time between the crime and the identification. *Neil v. Biggers*, 409 U.S. 188, 199 (1972). These factors should be weighed against the corrupting effect of a suggestive identification procedure. *Manson*, 432 U.S. at 114.

Here, Marcus Johnson specifically identified petitioner at trial as the person who he saw running through the Albertson's parking lot and then saw jump into a car and speed away. (R. 3:41-2). Johnson testified that he had a good view of the runner's face, both when he ran past him and when he was sitting in the car. (R. 3:41) He testified that his in-court identification was based solely on his viewing of petitioner at the place of the offense. (R. 3:42). Johnson also testified about his pretrial identification of petitioner at 2:30 a.m. on January 18, 2005. He was shown six photographs of African-American males, and petitioner stood out to him because of his facial features, including high cheekbones and gauntness. (R. 3:42-44). He further testified that he signed his name on the back of the photograph of the person he saw running in the parking lot. (R. 3:46).

The undisputed trial evidence shows that no more than a few hours elapsed between the eyewitness observation and the pretrial identification. The witness had a reasonable opportunity to see petitioner's face. He was certain that petitioner was the person he saw and did not identify anyone else. From his testimony, it is clear that he paid close attention to the person that he saw and later identified. Moreover, defense counsel cross-examined Johnson extensively about both his observation of the crime and his pretrial identification of petitioner. (R. 3:48-67). This cross-examination substantially lessens any danger of misidentification that the use of pretrial photo and live line-ups may create. *Simmons*, 390 U.S. at 384.

Under the totality of the circumstances, the in-court identification of Marcus Johnson was reliable, even assuming for purposes of this motion that the pretrial identification was impermissibly

suggestive. Under the facts of this case, the identification procedures did not give rise to a very substantial likelihood of irreparable misidentification. Consequently, there has been no constitutional violation in the identification procedures used. This claim was denied on its merits at the state habeas level, and this denial is not contrary to federal law. Petitioner's second ground for relief is without merit and should also be denied.

## V.  BEST EVIDENCE RULE

In his third ground for relief, petitioner asserts that the State violated his due process rights by presenting evidence at trial that was contrary to the "best evidence" rule. In particular, petitioner asserts that his constitutional rights were violated when the videotape from the Albertson's parking lot was not admitted into evidence.

During trial, Corporal Nichols testified about he saw on the videotaped recording of the Albertson's parking lot. Defense counsel objected to this testimony on grounds that it was not the best evidence of the video. This objection was overruled. (R. 3:103-04). Counsel did not object when the State offered the two still photographs from the videotape into evidence. (R. 3:105).

In federal habeas proceedings the court does not sit in review of a state court's interpretation of its own law. *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998), *cert. denied*, 526 U.S. 1148 (1999); *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995). Moreover, in federal habeas actions, a state court's evidentiary rulings will mandate relief only when an error is so extreme that it constitutes a denial of fundamental fairness. *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998), *cert. denied*, 526 U.S. 1118 (1999); *Andrade v. McCotter*, 805 F.2d 1190, 1193 (5th Cir. 1986). Under state law, the best evidence rule is set forth in Rule 1002 of the Texas Rules of Evidence. Rule 1002 states that "[t]o prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required except as otherwise provided in these rules or by law."

TEX. R. EVID. 1002. In *England v. State*, 946 S.W.2d 64 (Tex. Crim. App. 1997), the Court of Criminal Appeals explained that the historical reasons for the rule are that: 1) the nature of documents is such that exact words are important where a slight variation may mean a great difference in rights; 2) secondary evidence is susceptible to both human and mechanical error; 3) the rule promotes the prevention of fraud because it allows parties to examine originals for any defects; and 4) the appearance of the original may furnish information as to its authenticity and significance that may be lacking in a copy. *Id*. at 67-8, *citing Weinstein's Evidence* 1002[02] (1995).

Here, petitioner has not shown that the trial court erred in overruling defense counsel's objection, much less that any error rises to the level of fundamental unfairness. Corporal Nichols' testimony regarding the videotaped recording of the robbery in the parking lot was not offered for the purpose of proving the contents of the videotape. Instead, he testified that he viewed the videotape, but determined that it was of such poor quality that it was not useful evidence. There was therefore no evidence contained in the recording that the State was attempting to prove. The recording was therefore not used by the State in its case against petitioner. The state court's denial of this claim is not contrary to federal law. This ground for relief is without merit and should be denied.

### VI.  VOIR DIRE

In his fourth and fifth grounds for relief, petitioner asserts that the trial court violated his due process rights when it denied a defense motion for mistrial during jury voir dire and when the court made a statement to the jury panel regarding probation. Petitioner claims the prosecutor's and the trial court's statements tainted the entire jury pool because they amounted to evidence that he had a criminal history.

During jury voir dire, the prosecutor first informed the jury panel that the punishment range

for a first-degree felony is five to ninety-nine years or life in prison, and that certain evidentiary showings could bump the minimum sentence up to fifteen years under Texas law. (R. 2:71-2). The prosecutor then informed the jury panel that probation was not an issue in petitioner's case. Defense counsel objected to this last statement, and the trial judge stated to the jury panel that "in this particular case, probation is not an issue." After the jury was excused, defense counsel re-urged his objection, stating that there were jurors who would understand that probation not being available might mean that petitioner has a criminal background. The trial court denied defense counsel's objection and subsequent motion for mistrial. (R. 2:77-79). Later in the voir dire process, one of the venire members stated that she "had a problem" because it had been stated that probation was not an option, so therefore "there is some kind of history." (R. 2:102). Defense counsel responded that it was not known that there was a history. (R. 2:102). Later, defense counsel again made a motion for a mistrial because the venire member had alluded to that fact that probation not being available meant that petitioner was not eligible because of a criminal background. This motion was again denied. (R. 2:119-120). That venire member did not serve on the jury. (R. 2:119).

On direct appeal, petitioner argued that the prosecutor effectively informed the jury that petitioner had a prior conviction when he informed the jury panel that probation was not an issue in the case. The appellate court first noted that, under the Texas Code of Criminal Procedure, the State cannot read the enhancement portion of an indictment before the beginning of the punishment hearing. *See* TEX. CODE CRIM. PROC. ANN. art. 36.01(a)(1) (Vernon 2007). The State also may not give the specifics of the prior offenses, as this is tantamount to actually reading the enhancement paragraph or paragraphs. *See Frausto v. State*, 642 S.W.2d 506, 509 (Tex. Crim. App. 1982). This rule is to prevent the prejudice that would result from an announcement that the State believes that a defendant was previously convicted of an offense. *Rushing*, slip op. at 8; *see also Frausto*, 642

S.W.2d at 508. However, the appellate court noted that Article 36.01 does not prevent either the trial court or the prosecutor from informing the jury in hypothetical terms of the applicable range of punishment if the State proves any enhancements, and both the State and the defense have the right to inform a jury venire of the range of punishment applicable to an enhanced offense and to qualify it on the full range of punishment. *Rushing*, slip op. at 9; *see Frausto*, 642 S.W.2d at 509; *Johnson v. State*, 901 S.W.2d 525, 532 (Tex. App.–El Paso 1995, pet. ref'd).

The appellate court ruled that the prosecution was within the bounds of state law when he informed the jury that the minimum sentence could be bumped up to fifteen years if a certain evidentiary showing is met. The appellate court further ruled that the prosecutor's comment that "probation is not an issue" in the case also did not violate Article 36.01 or state law as set forth in *Frausto* because even assuming that potential jurors would have understood this to mean that petitioner had a prior conviction, this comment did not inform the jury panel of the specifics of the prior conviction. *Rushing*, slip op. at 9. The appellate court therefore overruled this issue. *Id*. The Court of Criminal Appeals refused this same claim when it was raised in the PDR, *Rushing v. State*, PDR-1324-07, and petitioner's fourth and fifth grounds for relief were denied on their merits when they were raised at the state habeas level. (S.H.Tr.:cover). These decisions are not contrary to federal law.

As noted earlier, in federal habeas proceedings the court does not sit in review of a state court's interpretation of its own law. *Creel v. Johnson*, 162 F.3d 385, 395 (5th Cir. 1998), *cert. denied*, 526 U.S. 1148 (1999); *Weeks v. Scott*, 55 F.3d 1059, 1063 (5th Cir. 1995). This Court therefore does not review the state court's determination that the prosecutor did not err in informing the jury panel that if certain evidence was shown, the minimum sentence would be fifteen years and that probation was not an issue in the case.

Even if these statements, and the statement regarding probation made by the trial judge, were constitutional error, petitioner would be entitled to federal habeas relief due to constitutional trial error only if such error had a substantial and injurious effect or influence on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993). Under *Brecht,*

> a constitutional trial error is not so harmful as to entitle a defendant to habeas relief unless there is more than a mere reasonable possibility that it contributed to the verdict. It must have had a substantial effect or influence in determining the verdict. We recognize, however, that if our minds are "in virtual equipoise as to the harmlessness," under the *Brecht* standard, of the error, then we must conclude that it was harmful.

*Mayabb v. Johnson*, 168 F.3d 863, 868 (5th Cir. 1999) (quoting *Woods v. Johnson*, 75 F.3d 1017, 1026-27 (5th Cir. 1996)). To be entitled to federal habeas relief due to a trial error, petitioner must show the error actually prejudiced him. *Brecht*, 507 U.S. at 637. Petitioner has not made this showing. One of the jury panel members who did not serve on petitioner's jury made a brief statement about there being a "history." However, neither the prosecutor nor the trial judge ever stated that petitioner had a prior conviction, and no specifics of any prior conviction were ever read to the jury prior to the punishment hearing. Moreover, the jurors who did sit on the jury in petitioner's case were instructed by the trial court an indictment is not evidence of guilt and could not be considered in determining guilt. The jury was also instructed that all persons are presumed innocent, that no one could be convicted of an offense unless each element of the offense is proven beyond a reasonable doubt, and that an arrest, confinement, or indictment does not give rise to an inference of guilt. The trial court then instructed the jury that the prosecution had the burden of proving petitioner's guilt by proving each element of the charge beyond a reasonable doubt. Finally, the court instructed the jurors that they were not to discuss the punishment petitioner may receive if found guilty when deciding their verdict. (Tr.:65-7). Given that no one mentioned petitioner

having a prior conviction to the jury panel, that the remark from the one veniremember about a "history" was a brief one, that this person did not serve on petitioner's jury, and that the jurors were specifically instructed not to discuss punishment in reaching a verdict on guilt and were instructed regarding the State's burden of proof, petitioner has not shown that any alleged error had a substantial effect or influence in determining the verdict. Petitioner's fourth and fifth grounds are without relief, and they should be denied.

## VII.  EVIDENTIARY HEARING

Upon review of the pleadings filed herein and the proceedings held in state court as reflected in the state-court records, an evidentiary hearing appears unnecessary.

## VIII.  RECOMMENDATION

The Court should **DENY** with prejudice the request for habeas corpus relief brought pursuant to 28 U.S.C. § 2254.

**SIGNED on this 17th day of February, 2010.**

                                                              _____
                                                              **IRMA CARRILLO RAMIREZ
                                                              UNITED STATES MAGISTRATE JUDGE**

**INSTRUCTIONS FOR SERVICE AND**
**NOTICE OF RIGHT TO APPEAL/OBJECT**

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE